UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LINDA LAGORIO,

                                          Plaintiff,

                    v.

HILTON CENTRAL SCHOOL DISTRICT, et al.,

                                          Defendants.

_____

<u>DECISION & ORDER</u>

17-CV-6460MWP


## <u>PRELIMINARY STATEMENT</u>

Plaintiff Linda Lagorio ("Lagorio") filed this case against defendants Hilton

Central School District (the "District") and Joe LaMarca ("LaMarca"), Director of

Transportation for the District, (together, the "defendants"), alleging claims of abuse of process

and malicious prosecution pursuant to 42 U.S.C. § 1983 and New York state common law.

(Docket # 17).[1]  Lagorio's claims arise from her interactions in October 2014 with two students

with special needs while she was monitoring them on a District school bus and the actions taken

by defendants in response to Lagorio's conduct.

Pending is defendants' motion for summary judgment pursuant to Rule 56 of the

Federal Rules of Civil Procedure.  (Docket # 33).  Pursuant to 28 U.S.C. § 636(c), the parties

---

[1]  Lagorio's second amended complaint, now the operative complaint in this case, also named Steve Ayers
("Ayers"), Assistant Superintendent for the District, as a defendant.  (Docket # 17).  At oral argument on
defendants' pending motion for summary judgment, Lagorio withdrew her opposition to the motion for judgment in
favor of Ayers; accordingly, this Court granted defendants' motion regarding Ayers.  (Docket # 39).  This Decision
and Order thus addresses Lagorio's claims against the District and LaMarca.

have consented to the disposition of this case by a United States magistrate judge.  (Docket # 22).  For the reasons stated below, defendants' motion is granted.

## FACTUAL BACKGROUND[2]

The District formerly employed Lagorio as a bus monitor for students with special needs, which required her to assist with the transportation of students to and from school.  (Defs' Statement at ¶¶ 2, 3).  On October 21 and 22, 2014, Lagorio was monitoring two students on the District's Bus 80, ten-year-old C.S. and six-year-old R.R. (the "Students"), each of whom was diagnosed with a behavioral disorder, as Lagorio knew.  (*Id.* at ¶¶ 2, 3, 4, 6).  Lagorio contends that the Students had a history of acting violently on Bus 80, which she apparently documented with the District by filing numerous incident reports.  (Pl's Add. Statement at ¶ 6).  Lagorio also claims that because of the Students' past behavior, she had previously requested that LaMarca remove the Students from Bus 80.  (*Id.* at ¶ 7).

Bus 80 was equipped with a surveillance camera that indisputably recorded the incidents involving Lagorio and the Students on October 21 and 22, 2014.  (Defs' Statement at ¶¶ 2, 4; *see also* Docket # 33-7 (Bus 80's video surveillance footage from October 21 and 22, 2014)).[3]  Defendants indicate that the interactions at issue on October 21, 2014 began when

---

[2]  The following facts are undisputed unless otherwise noted and are taken from defendants' Statement of Material Facts Pursuant to Local Rule 56 (Docket # 33-2) ("Defs' Statement"), and Lagorio's Response and Additional Local Rule 56 Statement of Material Facts (Docket # 36-1 (pages 2-9 consist of Plaintiff's Responses to Defendants' Statement of Facts ("Pl's Statement"), and pages 9-12 contain Plaintiff's Statement of Additional Undisputed Material Facts ("Pl's Add. Statement"))), both of which attach relevant exhibits.  For convenience, where the facts are undisputed, the Court will cite only to defendants' statement of the facts.  Citations to the parties' competing statements incorporate the evidentiary material cited therein.  The Court will also cite to specific exhibits as appropriate.

[3]  The surveillance footage from Bus 80 on October 21 and 22, 2014, submitted by defendants as Exhibit D (*see* Docket # 33-7), is especially relevant considering that both parties rely on this footage, at least to some extent, to support their version of what happened on those dates (*see* Defs' Statement at ¶¶ 14, 15; Pl's Statement at ¶¶ 14, 15).  At oral argument, Lagorio's counsel did not dispute the authenticity of Bus 80's surveillance footage; in fact,

*(footnote continued)*

Lagorio pulled on the harness straps that secured R.R. to his seat.  (Docket # 33-7, October 21, 2014 surveillance footage, at 15:22:20).[4]  It is not immediately evident what prompted Lagorio, who was sitting in front of R.R., to move to the seat behind him and pull on his harness.  It is clear, though, that R.R. expressed discomfort when Lagorio did so (*see*, *e.g.*, *id.* at 15:22:22-25, 15:23:39), and he can be heard on the video stating, "stop pulling my seat" (*id.* at 15:22:42) and "you're hurting my neck" (*id.* at 15:24:04).  Although not referenced by defendants, R.R. then started to throw books in Lagorio's direction (*see id.* at 15:24:30), presumably in response to Lagorio pulling on his harness, and the Students began to yell profanities (*see*, *e.g.*, *id.* at 15:26:04).  When C.S. gave R.R. another book to throw in Lagorio's direction, Lagorio stood over C.S., C.S. used more profanity towards Lagorio, and Lagorio visibly swung her hand and hit C.S.'s hat.  (*See id.* at 15:26:37-46).

---

he represented that the videos "speak for themselves."  Although defendants offer a detailed account of the events that occurred on Bus 80 with specific time-stamped citations, Lagorio simply "[c]ontest[s]" defendants' recitation, generally citing the surveillance footage as well as certain portions of her deposition testimony in which she describes her recollection of the events.  (*Compare* Defs' Statement at ¶¶ 14, 15 (citing Docket # 33-7), *with* Pl's Statement at ¶¶ 14, 15 (citing Docket ## 33-7; 33-20 at 92-99)).  Thus, it is not entirely clear which portions of defendants' account Lagorio specifically contests.  Rather, it appears that she merely disputes defendants' characterization of the surveillance footage.

The Court has reviewed the video evidence, *see*, *e.g.*, *Marcavage v. City of New York*, 689 F.3d 98, 110 (2d Cir. 2012) ("[a]lthough on summary judgment the evidence must be viewed in the light most favorable to [p]laintiffs as the non-moving parties, when there is reliable objective evidence – such as a recording – the evidence may speak for itself") (citing *Scott v. Harris*, 550 U.S. 372, 379-81 (2007)), *cert. denied*, 568 U.S. 1212 (2013); *Akinnagbe v. City of New York*, 128 F. Supp. 3d 539, 544 (E.D.N.Y. 2015) ("[t]he [c]ourt may consider video evidence in determining whether material questions of fact exist"), keeping in mind that "the mere existence of a videotape in the record depicting some or all of the events in dispute will not *always* be dispositive at the summary judgment stage," *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 482 (N.D.N.Y. 2017); *accord Fana v. City of New York*, 2018 WL 1581680, *6 (S.D.N.Y. 2018) ("[w]hile video evidence submitted by the parties should certainly be considered and carefully reviewed, summary judgment is appropriate only where the video evidence in the record is sufficient to blatantly contradict one party's versions of events") (alterations and quotations omitted).  In summarizing the video footage, the Court will recount what is clearly depicted in the relevant portions of the video surveillance, as well as the parties' differing explanations of what occurred to the extent that those explanations are not "blatantly contradict[ed]" by the surveillance footage.  *See Fana v. City of New York*, 2018 WL 1581680 at *6.

[4]  Citations to the video surveillance footage contained in Docket # 33-7 refer to the timestamp depicted in the lower right-hand corner of the videos.

A few minutes later, C.S. yelled more profanities at Lagorio, R.R. got free from his harness and jumped over to C.S.'s seat, and Lagorio told the bus driver, Colleen McGlenn ("McGlenn"), that she needed to pull the bus over.  (*See id.* at 15:29:10-36).  C.S. and R.R. then threw two shoes at Lagorio.  (*See id.* at 15:30:40-50).  In response, Lagorio approached C.S. and R.R. and grabbed C.S.'s arm.  (*See id.* at 15:30:51).  Lagorio told R.R. that if he did not return to his original seat, C.S. would get hurt (as she continued to hold C.S.'s arm).  (*See id.* at 15:31:10). Defendants assert that Lagorio twisted C.S.'s arm during this time (*see* Defs' Statement at ¶ 14); by contrast, Lagorio claims that she merely held it and C.S. himself twisted it (*see* Docket # 33-20 ("Lagorio Dep.") at 95).  In either event, C.S. can be heard expressing discomfort while Lagorio held his arm.  (Docket # 33-7, October 21, 2014 surveillance footage, at 15:31:07-15:32:03).

After briefly returning to his seat, R.R. then climbed to the front of Bus 80.  (*See id.* at 15:31:58).  In response, Lagorio let go of C.S. and grabbed the back of R.R.'s shirt to pull him back to his seat.  (*See id.* at 15:32:05).  Seconds later, after C.S. threw another item towards Lagorio, she stated that McGlenn needed to call 911.  (*See id.* at 15:32:20-30).  Lagorio went to back of the bus, picked up a shoe, and stood near C.S.'s seat for several seconds.  (*See id.* at 15:33:00-11).  C.S. grabbed the shoe and threw it at Lagorio.  (*See id.* at 15:33:12-14).  Lagorio picked up the shoe, stood in front of C.S. for a moment, and slapped the shoe across C.S.'s face, the sound of which can be heard on the surveillance footage.  (*See id.* at 15:33:15-20).[5]  Lagorio and C.S. then started to push, grab, and yell at each another, during which Lagorio can be heard

---

[5]  At her deposition, Lagorio testified that she "tossed [the shoe] back at [C.S.]" and that "it just so happened it hit him in the face."  (Lagorio Dep. at 96).  The video evidence "blatantly contradict[s]" that version of events, and the Court thus disregards Lagorio's unsupported characterization of that incident.  *See Fana*, 2018 WL 1581680 at *6; *see also Marcavage v. City of New York*, 689 F.3d at 110 (disagreeing with plaintiffs' "characteriz[ation] [that] their behavior toward the officers [was] cordial, and [their] conten[tion] that they were compliant," where "[e]ven viewed in the light most favorable to [p]laintiffs, the audio recordings show[ed] indisputably that [plaintiffs] were neither courteous nor compliant").

saying to C.S., "you hit me with [the shoe], you're go[ing to] get hit back."  (*See id.* at 15:33:24-15:33:30).

While these events were unfolding, at approximately 3:25 p.m., McGlenn contacted LaMarca and reported that there was an issue on Bus 80 and requested police intervention.  (Defs' Statement at ¶ 8).  In response, the District's bus garage contacted the police, and LaMarca, with the District's Head Bus Driver, Sylvia Rodak ("Rodak"), traveled to meet Bus 80 where it was parked.  (*Id.*).  When LaMarca arrived, police officers from the Town of Greece and the New York State Police were already on scene.  (*Id.* at ¶ 9).  LaMarca observed that books and papers were spread across the floor of Bus 80 but that no one had been injured. (*Id.*).  Rodak then assisted Lagorio and McGlenn to complete Bus 80's afternoon route, while LaMarca followed in a separate vehicle.  (*Id.*).  Afterwards, LaMarca spoke with Lagorio and McGlenn, "who both described a generally chaotic and physically violent scene aboard [Bus 80]."  (*Id.* at ¶ 10).  LaMarca stated that he would review Bus 80's surveillance footage of the incident.  (*Id.*).

The following morning, on October 22, 2014, Lagorio and McGlenn transported the Students to school on Bus 80.  (*Id.* at ¶ 11).  Although not detailed by defendants, at approximately 8:12 a.m., C.S. seemingly helped R.R. get loose from his harness.  (Docket # 33-7, October 22, 2014 surveillance footage, at 8:11:47).  Almost immediately, Lagorio requested McGlenn to pull over, indicating that she was not going to do "this anymore."  (*Id.* at 8:11:55).  A few minutes later, R.R. stood up in his seat, prompting Lagorio to grab his legs in an apparent attempt to pull his legs out from under him.  (*See id.* at 8:15:55).

After R.R. settled in a new seat, C.S. then pulled out a pair of scissors and held them above his head, which Lagorio was quickly able to grab and remove from his hand.  (*See*

*id.* at 8:17:32-43).  Concerned by the fact that C.S. had scissors, McGlenn contacted the District bus garage and requested that 911 be called.  (*See id.* at 8:17:53).  C.S. then started tossing writing utensils in the direction of McGlenn.  (*See id.* at 8:18:30).  Soon afterwards, C.S. took Lagorio's cell phone, and McGlenn pulled Bus 80 to the side of the road.  (*See id.* at 8:18:55-8:19:30).  Lagorio eventually attempted to take back her cell phone from C.S.  (*See id.* at 8:21:06).  In the process, the two began to struggle, during which Lagorio grabbed C.S.'s arm. (*See id.* at 8:21:14-20).  Defendants contend that Lagorio twisted C.S.'s arm; Lagorio states that she merely held it in an attempt to "restrain" him.  (*Compare* Defs' Statement at ¶ 15, *with* Lagorio Dep. at 95-96).  Several seconds after this physical struggle began, Lagorio can be seen standing over C.S. in his seat and appears to slap C.S., which can be heard from the video footage.  (Docket # 33-7, October 22, 2014 surveillance footage, at 8:21:21).  It is not clear from the footage what Lagorio slapped, and she denied that she struck him in the face.  (*See* Lagorio Dep. at 99).  Lagorio and C.S. continued to struggle with each other for several seconds. (Docket # 33-7, October 22, 2014 surveillance footage, at 8:21:22-35).

In response to McGlenn's call, LaMarca again met Bus 80 where it had pulled over.  (Defs' Statement at ¶ 11).  LaMarca observed that Town of Ogden police officials had responded to the 911 call, neither Lagorio nor McGlenn had been injured, and R.R. was "seated calmly" on Bus 80.  (*Id.* at ¶ 12).  C.S., however, was placed into an ambulance, and Ogden Police Officer Steve Ploof ("Officer Ploof") approached LaMarca for more information about C.S.  (*Id.*).  Lagorio disputes any suggestion that C.S. required medical assistance as a result of the incident.  (Pl's Statement at ¶ 12).  McGlenn and Lagorio eventually continued their morning route and took R.R. to school.  (Defs' Statement at ¶ 12).

6

Before LaMarca could review Bus 80's surveillance footage, he received two phone calls related to the above incidents.  (*Id.* at ¶ 13).[6]  One of these calls was from Officer Ploof, who advised LaMarca that he was investigating Lagorio's conduct on Bus 80 "after the Gates Ambulance Corps filed a mandatory report of suspected child abuse."  (*Id.*).  Apparently, Officer Ploof informed LaMarca that C.S. told ambulance personnel that Lagorio had punched, choked, slapped and hit him, and had choked R.R.  (*Id.*).  LaMarca reviewed the surveillance footage from Bus 80 on October 22, 2014.  (*Id.*).

The following day, LaMarca placed Lagorio on administrative leave.  (Pl's Add. Statement at ¶ 13).  In addition, the District employees who viewed the video surveillance footage "determined that they were obligated, as mandatory reporters, to contact the authorities," a determination Lagorio disputes.  (*Compare* Defs' Statement at ¶ 16, *with* Pl's Statement at ¶ 16).[7]  District employees contacted the authorities, and the New York State Police subsequently

---

[6]  Lagorio contests the assertions made in paragraph 13 of defendants' Statement of Material Facts because the exhibit defendants cite in support of that paragraph, Exhibit H (*see* Docket # 33-11), neither "refer[s] nor support[s] any of the several allegations included in [that paragraph]" (*see* Pl's Statement at ¶ 13).  Lagorio is correct; Exhibit H consists of the incident reports completed by McGlenn and Lagorio, which are not supportive of defendants' assertions in this paragraph.  (*See generally* Docket # 33-11).  My review of the record, however, suggests that defendants have simply erred in the citation, as defendants' counsel's affidavit identifies Exhibit H as the "Incident Report of Joe LaMarca" (Docket # 33-3 at ¶ 4), which it clearly is not.  LaMarca's incident report appears in several places in the record (*see* Docket ## 33-10 at 27-29; 33-13 at 56-58, 112-114) and lends support to defendants' assertions.

[7]  LaMarca asserts that, as Director of Transportation for the District, he is a mandatory reporter under New York State law.  (*See* Defs' Statement at ¶ 16; *see also* Docket # 33-22 at 90 (LaMarca confirming that he is a mandatory reporter)).  The record establishes that fact.

In relevant part, New York Social Services Law requires that a "school official" or "school administrator"

> report or cause a report to be made . . . when they have reasonable cause to suspect that a child coming before them . . . is an abused or maltreated child, or when they have reasonable cause to suspect that child is an abused or maltreated child where the . . . person legally responsible for such child comes before them . . . and states from personal knowledge facts, conditions or circumstances which, if correct, would render the child an abused or maltreated child.

N.Y. Soc. Serv. Law § 413(1)(a) (effective July 1, 2014 to June 30, 2015).

*(footnote continued)*

began an investigation into the incidents.  (Defs' Statement at ¶ 16).  In connection with that investigation, on October 29, 2014, Officer Stephen LaLonde ("Officer LaLonde"), an investigator with the New York State Police, obtained a formal statement from Lagorio about the incidents that occurred on Bus 80.  (*Id.* at ¶ 17).  Lagorio resigned from her position with the District later that day.  (*Id.*).  Lagorio claims she did so because she felt pressure to quit, asserting that the District planned to discipline her "up to and including termination."  (Pl's Add. Statement at ¶¶ 22-23).

On October 30, 2014, Officer LaLonde met with LaMarca and Ayers in Ayers's office, at which time Officer LaLonde viewed the surveillance footage from Bus 80.  (Defs' Statement at ¶ 18).  Afterwards, Officer LaLonde "advised defendants that he would be issuing two appearance tickets to [Lagorio] for endangering the welfare of a child."  (*Id.*).  LaMarca contends that he had no further contact with the police on this matter following the meeting.  (*Id.*).  Lagorio disputes these assertions, claiming that Officer LaLonde "informed [her] [that LaMarca] requested that charges be pressed against her."  (Pl's Statement at ¶ 18).

On November 4, 2014, Officer LaLonde issued an appearance ticket to Lagorio for two counts of endangering the welfare of a child.  (Defs' Statement at ¶ 19).  Shortly thereafter, the Monroe County District Attorney's Office commenced criminal proceedings against Lagorio in Greece Town Court, which lasted for approximately one year and concluded following a bench trial.  (*Id.* at ¶ 20).  LaMarca claims that he "had little role in the prosecution

---

Moreover, New York Education Law provides:

> [i]n any case where an oral or written allegation is made to a . . . school administrator . . . that a child has been subjected to child abuse by an employee or volunteer in an educational setting, such person shall upon receipt of such allegation . . . promptly complete a written report of such allegation.

N.Y. EDUC. LAW § 1126(1)(a) (effective July 1, 2001 to June 4, 2019).

of [Lagorio] aside from . . . providing approximately 30 minutes of testimony at [Lagorio's] trial (as well as a conversation [with the assistant district attorney] just prior to the trial testimony, which took place in the courthouse, and lasted approximately two minutes)." (*Id.* at ¶ 21). To the contrary, Lagorio contends that LaMarca played an "active role in criminal proceedings being commenced" against her, relying on her assertion that Officer LaLonde "informed [her] [that LaMarca] requested that charges be pressed against her." (Pl's Statement at ¶¶ 20, 21). At Lagorio's bench trial, the video surveillance footage from Bus 80 was admitted into evidence and reviewed by the presiding judge. (Defs' Statement at ¶ 22). Lagorio was acquitted on both charges on December 23, 2015. (*Id.* at ¶ 23).

## DISCUSSION

### I.   Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In reaching this determination, the court must assess whether there are any disputed material facts and, in so doing, must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 166-67 (2d Cir. 1991). A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248; *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d at 97.

9

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, after which the non-moving party must come forward with sufficient evidence to support a jury verdict in its favor; the motion will not be defeated based upon conjecture, surmise or the existence of "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), *cert. denied*, 502 U.S. 849 (1991). The party seeking to avoid summary judgment "must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 . . . , that there are specific factual issues that can only be resolved at trial." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

> As the Second Circuit has explained:
>
> [T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution. . . . [I]t must be kept in mind that only by reference to the substantive law can it be determined whether a disputed fact is material to the resolution of the dispute.

*Gallo v. Prudential Residential Serv., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).


## II.    Lagorio's Section 1983 Claims[8]

Lagorio asserts her first two claims against LaMarca for abuse of process and malicious prosecution under 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution. (Docket ## 17 at ¶¶ 63-79; 36 at 5, 8). LaMarca's principal argument on summary

---

[8]  As confirmed by her counsel, Lagorio pleads her federal claims only against LaMarca, not the District. (*See* Docket # 17 at ¶¶ 63-79). Accordingly, the Court will analyze these claims with respect to LaMarca only.

judgment is that these claims (as well as Lagorio's same claims based on New York State common law) "arise[] directly from [LaMarca's] compliance with[,] [as a District administrator, his] mandatory reporting obligations [concerning suspected child abuse] and [are therefore] statutorily barred [pursuant to New York state law]."  (Docket # 33-1 at 13 (citations omitted)).  In LaMarca's view, his statutory reporting obligations were triggered because he "reasonably believed, based on objective video evidence, that [Lagorio] had physically abused the [S]tudents aboard Bus 80 on October 21, 2014 and October 22, 2014."  (*Id.*).

During oral argument, this Court questioned defendants' counsel concerning the applicability of the immunity afforded by New York's mandatory reporting statutes to Lagorio's federal claims and permitted the parties the opportunity to submit supplemental briefing on this issue.  (*See* Docket # 39 at 2).  In response, LaMarca "formally withdr[ew] [his] statutory immunity arguments relative to [Lagorio's] § 1983 claims" and asserted for the first time that those claims should "be dismissed pursuant to the doctrine of qualified immunity."  (Docket # 40 at 3).  LaMarca also reiterated his position that the claims should be dismissed because Lagorio cannot "raise a triable issue of fact on the essential elements of her federal claims."  (*Id.*).  In reply, Lagorio unsurprisingly challenged the timeliness of LaMarca's qualified immunity argument.  (*See generally* Docket # 41).

I do not reach the issue of whether LaMarca's qualified immunity argument, raised for first time after oral argument, is properly before the Court because Lagorio's federal claims do not otherwise raise triable issues of fact and should be dismissed on the merits.

A.    **Abuse of Process**

"Procedural due process forbids the use of legal process for a wrongful purpose." *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994).  "Therefore, a defendant may be liable under

11

section 1983 for malicious abuse of the criminal process."  *Richardson v. New York City Health
& Hosp. Corp.*, 2009 WL 804096, *15 (S.D.N.Y. 2009) (citing *Savino v. City of New York*, 331
F.3d 63, 76-77 (2d Cir. 2003)).  State law governs an abuse of process claim under 42 U.S.C.
§ 1983.  *See Cook v. Sheldon*, 41 F.3d at 80.

Under New York state law, to prevail on a claim for abuse of process, a plaintiff
must show that a defendant "(1) employ[ed] regularly issued legal process to compel
performance or forbearance of some act[,] (2) with intent to do harm without excuse or
justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of
the process."  *Savino v. City of New York*, 331 F.3d at 76 (quoting *Cook*, 41 F.3d at 80); *accord
Curiano v. Suozzi*, 63 N.Y.2d 113, 116 (N.Y. 1984).

LaMarca maintains that he did not "institute or employ" legal process because he
"merely reported behavior [pursuant to his statutory obligations] that [he] observed first-hand via
the bus surveillance videos that [he] reasonably believed was violent and abusive."  (Docket
# 33-1 at 19 (quotations omitted)).  He further states that after contacting the authorities, "[a]t no
point did [he] express any desire for [Lagorio's] arrest, [give his] opinion as to the charges, or
provide any advice to the police," who, according to LaMarca, "investigated the incident and
advised [him] . . . that they would issue appearance tickets for endangering the welfare of a child
to [Lagorio]."  (*Id.*).

In opposing summary judgment, Lagorio contends that LaMarca "employed"
legal process against her by "improperly contribut[ing]" to her arrest and prosecution.[9]  (*See*
Docket # 36 at 7-8 (citations omitted)).  As support, Lagorio asserts that Officer LaLonde at

---

[9]  Although not specifically addressed by the parties, the Court assumes that the legal process at issue is the
November 4, 2014 appearance ticket.  *See*, *e.g.*, *Macdonough v. Spaman*, 2016 WL 1298134, *10 (N.D.N.Y. 2016)
("[u]nder the first element [of an abuse of process claim], [p]laintiff received an appearance ticket to appear in court
on criminal charges, which courts have held constitutes a regularly issued legal process").

some point told her that LaMarca had "requested that charges be pressed against [Lagorio]."  (*Id.* at 5, 8 (citing Lagorio Dep. at 22-23, 51; Docket # 33-22 ("LaMarca Dep.") at 66-67)).  Aside from this assertion, Lagorio does not point to *any* other evidence that LaMarca "employed" legal process.  Indeed, at oral argument, Lagorio's counsel confirmed that this first element of the abuse of process claim rested on LaMarca's supposed request that Officer LaLonde press charges against Lagorio.

The record does not support Lagorio's critical assertion.  Lagorio testified that on October 29, 2014, Officer LaLonde appeared at her home to obtain a formal statement regarding the incidents on Bus 80, at which time Lagorio provided two written "supporting depositions." (Lagorio Dep. at 22-23; *see also* Docket # 33-17 at 2-3 (Lagorio's "supporting depositions" dated October 29, 2014)).  At that time, Lagorio "asked [Officer LaLonde] point-blank [if she was] going to be arrested or what [was] happening here[,]" to which Officer LaLonde responded "well, we don't know that yet."  (Lagorio Dep. at 29).  Lagorio understood this to mean that Officer LaLonde was "still looking into" the situation and that "anything was possible."  (*Id.* at 29-30).  Officer LaLonde ultimately issued Lagorio an appearance ticket for two counts of endangering the welfare of a child on November 4, 2014 (*see* Docket # 33-15 at 2), and two temporary orders of protection were served personally on Lagorio in Greece Town Court on November 19, 2014 (*see* Docket # 33-13 at 60-61).

Lagorio testified that "[e]ventually" Officer LaLonde told her that LaMarca had requested that these actions be taken (Lagorio Dep. at 30, 51), although it is not clear when that alleged conversation took place.  In clarifying testimony, Lagorio stated that Officer LaLonde told her that LaMarca requested two temporary orders of protection be issued for the Students against Lagorio – not that charges for endangering the welfare of a child be pressed – and that

13

Lagorio believed the charges and the orders of protection were the same thing. (*See* Lagorio Dep. at 30 ("[Officer LaLonde] ultimately told [Lagorio] that [LaMarca] was the one that requested the . . . Orders of Protection"); *see also id.* at 52 ("Q: [d]o you understand the difference between charges and Orders of Protection?[;] A: I thought it was all connected[;] Q: . . . [d]id Joe LaMarca ask Officer LaLonde to issue you the appearance tickets for endangering the welfare of a child?[;] A: I'm not aware of that"); *id.* at 53 ("Q: [b]ut as you sit here today, you are not aware of any requests by Joe LaMarca that you be issued appearance tickets for endangering the welfare of a child?[;] A: . . . it must have been the PTOs or whatever you call them, Protective Order"); *id.* at 56 ("Q: [w]ere you ever present for any conversation where you heard one of the [d]efendants . . . Joe LaMarca, Steve Ayers, or the [D]istrict request that criminal charges be pressed against you?[;] A: [n]o, was not aware . . . I just thought it was an automatic thing when you get the [orders of protection]")). Lagorio further clarified that Officer LaLonde did not tell her anything else about his conversation with LaMarca other than the alleged statement about orders of protection. (*See id.* at 30). Lagorio also admitted that her belief that LaMarca requested the orders of protection was based on assumption. (*See id.* at 53 ("Q: [d]id [Officer] LaLonde know that [LaMarca made the request for the orders of protection] for a fact or did he just assume that [LaMarca] had [made that request]?[;] . . . A: I don't know")). In addition, LaMarca did not testify that he requested Officer LaLonde to press charges against Lagorio for endangering the welfare of a child. In fact, he testified that his "only recollection . . . [was] that [Officer LaLonde] t[old] Steve Ayers there would be criminal charges filed [after viewing the video footage]" (LaMarca Dep. at 68-69; *accord id.* at 60 ("[LaMarca] was present with Steve Ayers[;] [Officer LaLonde] basically reviewed the film and said that

based on the actions of [Lagorio], we'd have some criminal charges") – not the other way around.

In short, the evidence cited by Lagorio simply does not support her factual assertion that LaMarca requested Officer LaLonde to press criminal charges against her; rather, her claim appears to be based on either a mistaken belief or mere speculation – neither of which suffices at this stage to raise a triable issue of material fact. *See Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) ("conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment").  Accordingly, the Court will disregard Lagorio's unsupported assertion.  *See Macera v. Vill. Bd. of Ilion*, 2019 WL 4805354, *2 (N.D.N.Y. 2019) ("[a]s always at the summary judgment stage, the [c]ourt reserves the right to disregard any assertions made by either party if those factual assertions are otherwise unsupported in the record") (alterations and quotations omitted); *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 305 (S.D.N.Y. 2015) ("if a party fails to properly support a statement by an adequate citation to the record, the [c]ourt may properly disregard that assertion") (citing *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73-74 (2d Cir. 2001)).

Without this evidence, Lagorio's abuse of process claim fails because she identifies no other evidence that LaMarca "employed" legal process against her.  Rather, the undisputed evidence demonstrates that LaMarca and District personnel reviewed the video surveillance footage and contacted the relevant authorities only after determining that Lagorio's conduct depicted in the video obligated them to do so.  (Defs' Statement at ¶ 16).  The New York State Police then conducted an independent investigation of the matter, during which Officer LaLonde came to the District office and met with LaMarca and Ayers on October 30, 2014 and was provided with a copy of the surveillance footage, which he then viewed.  (*Id.* at ¶¶ 16, 18).

Officer LaLonde issued Lagorio an appearance ticket on November 4, 2014, after he had viewed the video surveillance footage, and the Monroe County District Attorney's Office thereafter decided to commence criminal proceedings against Lagorio.  (*Id.* at ¶¶ 19-20).

In other words, no evidence exists in the record that LaMarca had any involvement in the underlying proceedings between the time that Officer LaLonde met with him on October 30, 2014 and his appearance at Lagorio's trial.  (*Id.* at ¶¶ 18, 21).  Without more, these undisputed facts are insufficient to raise a triable issue of fact that LaMarca "employed" legal process against Lagorio – a deficiency that warrants dismissal of Lagorio's abuse of process claim.  *See*, *e.g.*, *Vlach v. Staiano*, 2014 WL 2927161, *4-5 (N.D.N.Y. 2014) (plaintiff's abuse of process claim failed because defendant "did not affirmatively instigate or procure [plaintiff's] arrest"[;] "there is no indication in the record that the decision to arrest was motivated by information provided by [defendant] and not the State Police's own investigation, nor is there any indication that [defendant] made the decision to arrest or induced the police to arrest[;] . . . [defendant] merely notified the police of [plaintiff's] alleged crime, at the direction of his supervisor[;] . . . [t]he police then conducted their own investigation and decided to arrest, and ultimately prosecute [plaintiff][;] . . . [b]ecause there is no evidence that [defendant] engaged in conduct for the purpose of promoting or facilitating [plaintiff's] arrest and prosecution, [defendant] is granted summary judgment on [plaintiff's abuse of process claim]") (alterations and quotations omitted), *aff'd*, 604 F. App'x 77 (2d Cir. 2015) (summary order).

Even setting aside that deficiency, Lagorio cannot demonstrate that LaMarca acted "in order to obtain a collateral objective that is outside the legitimate ends of the process." *See Savino*, 331 F.3d at 76.  "The crux of a malicious abuse of process claim is the collateral objective element."  *Kraft v. City of New York*, 696 F. Supp. 2d 403, 416 (S.D.N.Y. 2010), *aff'd*,

16

441 F. App'x 24 (2d Cir. 2011) (summary order).  "To meet this element, a plaintiff must prove

not that defendant acted with an improper motive, but rather an improper purpose."  *Id.*  In other

words, "[t]he focus is on whether the defendant employed legal processes to accomplish a

purpose outside of that for which the process was designed."  *Simons v. New York*, 472

F. Supp. 2d 253, 265-66 (N.D.N.Y. 2007), *aff'd*, 287 F. App'x 924 (2d Cir. 2008) (summary

order); *see also Folk v. City of New York*, 243 F. Supp. 3d 363, 375 (E.D.N.Y. 2017) ("[a]buse of

process resembles a form of extortion, by which the defendant invokes legal process to coerce

the plaintiff into doing something other than what the process necessitates") (citation omitted).

As the Second Circuit has observed, "[t]he gist of abuse of process is the

improper use of process *after* it is regularly issued."  *Cook*, 41 F.3d at 80 (emphasis supplied)

(citation omitted).  Under this reasoning, "[t]he pursuit of a collateral objective must occur after

the process is issued; the mere act of issuing process does not give rise to a claim."  *Marcano v.*

*City of Schenectady*, 38 F. Supp. 3d 238, 261 (N.D.N.Y. 2014) (quoting *Lopez v. City of New*

*York*, 901 F. Supp. 684, 691 (S.D.N.Y. 1995)); *Gilman v. Marsh & McLennan Cos.*, 868

F. Supp. 2d 118, 131 (S.D.N.Y. 2012) (same), *aff'd*, 654 F. App'x 16 (2d Cir. 2016) (summary

order).[10]

---

[10]  In *Parkin v. Cornell Univ.*, 78 N.Y.2d 523 (N.Y. 1991), the New York Court of Appeals suggested in *dicta* that its holdings would not necessarily "preclude an abuse of process claim based on the issuance of the process itself," but ultimately left open the question of whether "abuse of process requires some improper conduct *after* issuance of process."  78 N.Y.2d at 530.  Subsequently, in *Cook*, a decision that post-dates *Parkin*, the Second Circuit articulated that abuse of process centers on the question of improper use of process "after it is regularly issued."  *Cook*, 41 F.3d at 80.  Moreover, a New York appellate court has since affirmed this requirement.  *See Place v. Ciccotelli*, 121 A.D.3d 1378, 1380 (3d Dep't 2014) ("[i]n general, such a claim will only lie for improperly using process after it is issued") (quotations omitted).

I agree with those courts that have concluded that *Cook* is binding.  *See Mesa v. City of New York*, 2013 WL 31002, *26 (S.D.N.Y. 2013) (collecting cases); *Gilman v. Marsh & McLennan Cos.*, 868 F. Supp. 2d at 131-32 ("the *dicta* quoted by [p]laintiffs from *Parkin* does not alter the established law governing malicious abuse of process claims") (quoting *Richardson v. New York City Health & Hosps. Corp.*, 2009 WL 804096 at *16).  *But see Crockett v. City of New York*, 2015 WL 5719737, *10 (E.D.N.Y. 2015) (quoting *Parkin v. Cornell Univ.*, 78 N.Y.2d at 530).

Lagorio's argument in support of the "collateral objective" element is difficult to decipher.  She asserts that before LaMarca disclosed Bus 80's video surveillance footage to Officer LaLonde on October 30, 2014, the "[D]istrict planned to discipline [her], up to and including termination" because of her conduct on Bus 80 on October 21 and 22, 2014.  (Docket # 36 at 8).  Lagorio also reasserts her unsupported contention that Officer LaLonde told her that LaMarca requested charges be pressed against her.  (*Id.* at 9).  According to Lagorio, "[f]eeling pressure to quit, [she] resigned her employment with the [D]istrict during [her October 29, 2014] meeting [with District officials]."  (*Id.* at 8-9).  Finally, Lagorio contends that the District "had concerns about legal ramifications such as a parent suing the [D]istrict for inappropriate behavior of [Lagorio] prior to [LaMarca] turning over the [Bus 80] surveillance videos to Officer LaLonde."  (*Id.* at 9).

Fatal to Lagorio's claim is the undisputed fact that LaMarca's and the District's alleged conduct occurred *before* Officer LaLonde issued Lagorio the November 4, 2014 appearance ticket.  Officer LaLonde issued the appearance ticket to Lagorio only after viewing the video surveillance footage on October 30, 2014.  (Defs' Statement at ¶¶ 17-18).  By the time Lagorio received her appearance ticket, she had already resigned from her position with the District (*id.* at ¶ 17), and Lagorio does not point to any evidence to establish that LaMarca or the District pursued an improper purpose after November 4, 2014.  Lagorio thus has not established the "collateral objective" element of her abuse of process claim – an independent basis upon which her claim fails and should be dismissed.

For all these reasons, Lagorio's abuse of process claim pursuant to 42 U.S.C.
§ 1983 fails as a matter of law.[11]

### B.    <u>Malicious Prosecution</u>

"In order to prevail on a § 1983 claim against a state actor for malicious
prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment . . . and
must establish the elements of a malicious prosecution claim under state law."  *Manganiello v.
City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010) (citations omitted).  In New York, to
establish a malicious prosecution claim, a plaintiff must prove "(1) the initiation or continuation
of a criminal proceeding against plaintiff[,] (2) termination of the proceeding in plaintiff's
favor[,] (3) lack of probable cause for commencing the proceeding[,] and (4) actual malice as a
motivation for defendant's actions."  *Id.* at 161 (quotations omitted) (citing *Murphy v. Lynn*, 118
F.3d 938, 947 (2d Cir. 1997), *cert. denied*, 522 U.S. 1115 (1998)).[12]  Additionally, in the § 1983
context, a plaintiff must show "a sufficient post-arraignment liberty restraint to implicate the
plaintiff's Fourth Amendment rights."  *Rohman v. New York City Transit Auth.*, 215 F.3d 208,
215 (2d Cir. 2000).

Moreover, "[g]enerally, a civilian defendant who merely furnishes information to
law enforcement authorities who are then free to exercise their own independent judgment as to
whether an arrest will be made and criminal charges filed will not be held liable for malicious
prosecution."  *Udechukwu v. City of New York*, 333 F. Supp. 3d 161, 170 (E.D.N.Y. 2018)
(citation omitted); *accord Rothstein v. Carriere*, 373 F.3d 275, 293-94 (2d Cir. 2004) ("reporting

---

[11]  Lagorio does not even attempt to offer evidence or any argument to show that LaMarca employed legal
process "with intent to do harm without excuse or justification" (*see* Docket # 36 at 8-9), which is another critical
omission.

[12]  Here, there is no dispute that Lagorio was acquitted on the two charges of endangering the welfare of a
child.  (*See* Defs' Statement at ¶¶ 20, 23).  Therefore, Lagorio has shown that her underlying criminal prosecution
terminated in her favor.

a crime to law enforcement and giving testimony does not constitute the 'initiation' of a criminal prosecution").  Therefore, for a civilian defendant to "initiate" criminal proceedings, a plaintiff must show that the defendant "played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act."  *Rothstein v. Carriere*, 373 F.3d at 294 (quotations omitted).  "A civilian complainant who neither knowingly provides false information nor plays an active role in the prosecution cannot be held liable for malicious prosecution." *Udechukwu v. City of New York*, 333 F. Supp. 3d at 170-71 (citation omitted).

Lagorio asserts that LaMarca "initiated" criminal proceedings by requesting that Officer LaLonde press charges against her.  (Docket # 26 at 5).  For the reasons discussed above (*see supra*, § II.A), that assertion is unsupported by the record and has no relevance to resolution of this motion.  Thus, the record is devoid of competent evidence supporting the proposition that LaMarca, who merely contacted the authorities, provided information to Officer LaLonde during a meeting with him, and later provided testimony at Lagorio's trial, played an "active role" in the underlying state criminal proceedings.  *See Llerando-Phipps v. City of New York*, 390 F. Supp. 2d 372, 382 (S.D.N.Y. 2005) ("[f]or laypersons who are defendants in cases of malicious prosecution, courts have held that simply reporting a crime to the police and serving as a witness does not meet the first element of initiating a criminal proceeding") (collecting cases).  Lagorio thus cannot show that LaMarca "initiated" criminal proceedings against her, and her malicious prosecution claim fails for this reason alone.

In addition, and alternatively, Lagorio cannot show the absence of probable cause relating to her underlying criminal proceedings.  "Even if a civilian complainant is ultimately incorrect in his belief as to whether a person is committing a crime, he need only have had a reasonable basis for this belief in order to have the probable cause necessary to defeat a

malicious prosecution . . . claim." *Pacicca v. Stead*, 456 F. App'x 9, 12 (2d Cir. 2011) (summary order) (alterations and citation omitted).  Where, as here, the defendant is "a civilian complainant, to overcome the presumption of probable cause, a plaintiff must plead facts to show that that complainant gave false information or withheld information from the arresting officer." *TADCO Constr. Corp. v. Dormitory Auth. of State of New York*, 700 F. Supp. 2d 253, 275 (E.D.N.Y. 2010) (quotations omitted).

In an effort to meet this element, Lagorio asserts that "LaMarca withheld evidence or otherwise acted in bad faith" by allegedly withholding from Officer LaLonde the video surveillance footage until after Officer LaLonde had arrested Lagorio.  (Docket # 36 at 6).  Lagorio's account is plainly belied by the record.  Lagorio was neither arrested nor issued the temporary orders of protection until after LaMarca made the surveillance footage available to Officer LaLonde, who viewed the footage on October 30, 2014.

Moreover, no evidence in the record demonstrates or suggests that LaMarca and the District acted unreasonably in contacting the authorities to report Lagorio's conduct, which they did only after viewing the video surveillance footage.  (Defs' Statement at ¶ 16).  Indeed, there is no evidence that LaMarca "gave false information or withheld information from" Officer LaLonde at their October 30, 2014 meeting.  *See TADCO Constr. Corp. v. Dormitory Auth. of State of New York*, 700 F. Supp. 2d at 275.  Rather, the evidence reveals that Officer LaLonde in fact reviewed for himself the video surveillance footage as part of his investigation before issuing the appearance ticket to Lagorio.  Described in more detail above, that video surveillance footage depicts that Lagorio made physical contact with the Students multiple times, including by slapping C.S. in the face with a shoe.  Based upon this Court's review of the video surveillance footage, LaMarca and the District had a reasonable basis to contact the authorities to

report Lagorio's conduct, and the video further provided probable cause for the subsequent

charges.  *See Savino*, 331 F.3d at 72 ("[t]he existence of probable cause is a complete defense to

a claim of malicious prosecution in New York"); *see*, *e.g.*, *Buckley v. AlliedBarton Sec. Servs.,*

*LLC*, 708 F. App'x 37, 38 (2d Cir. 2018) (summary order) (affirming summary judgment

dismissing plaintiff's malicious prosecution claim; "[s]ummary judgment was appropriate

because even without reference to the alleged false statements, the authorities had probable cause

to initiate and continue the proceeding against [plaintiff][;] . . . [s]tatements by [defendant] and

video recordings of the incident adequately establish probable cause for the [criminal] charge").

Accordingly, Lagorio's claim for malicious prosecution fails for this independent reason.


## III.    Lagorio's New York State Common Law Claims

Lagorio's New York common law claims for abuse of process and malicious

prosecution rely on the same contentions as her federal law claims.  (*See generally* Docket # 36).

Accordingly, for the same reasons stated above, Lagorio's state-law claims against LaMarca also

fail.[13]  *See*, *e.g.*, *Forsythe v. City of Watertown*, 2020 WL 1274270, *7 (N.D.N.Y. 2020)

("[p]laintiff's state-law claims [for, *inter alia*, abuse of process and malicious prosecution]

against [individual defendants] are identical to the claims that [p]laintiff asserted against them

under § 1983, and the [c]ourt's analysis of those claims would be the same[;] [t]hus, the state-law

claims would fail for the same reasons that the § 1983 claims fail").

Lagorio's counsel represented at oral argument that her claim of liability against

the District is premised only on the theory of *respondeat superior*.  Yet, "[i]t is well-established

. . . that *respondeat superior* is not a cause of action at all, but a theory of liability that must

---

[13]  Because Lagorio's state-law claims are entirely dismissible on their merits, I do not reach the question whether they are also barred by statutory immunity.

attach to a separate claim." *Lederman v. Benepe*, 2016 WL 11588628, *5 (S.D.N.Y. 2016) (quotations omitted). Because each of Lagorio's state-law claims against LaMarca have been dismissed, "there is no basis under New York law for a *respondeat superior* claim against" the District. *Id.* (collecting cases). Therefore, Lagorio's claim for liability against the District is also dismissed.

## <u>CONCLUSION</u>

For the above-stated reasons, defendants' motion for summary judgment (**Docket # 33**) is **GRANTED**. Lagorio's claims against defendants are dismissed in their entirety and with prejudice, and the Clerk of Court is directed to enter judgment in favor of defendants and to close this case.

**IT IS SO ORDERED.**

                                                            *s/Marian W. Payson*
                                                         MARIAN W. PAYSON
                                                      United States Magistrate Judge

Dated:  Rochester, New York
          September 2, 2020

23